**HN LAW LLC**
Thomas R. Nolasco Bar No. 020899
16427 N. Scottsdale Rd., Suite 130
Scottsdale, AZ 85254
Phone: 480-347-0731

FILED ☑ LODGED ___
RECEIVED ___ COPY ___

FEB 2 6 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____DEPUTY

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

United States of American ex rel. Jane Doe,

Relator/Plaintiff

v.

Pinnacle Bank, an Arizona Corporation, PB Financial Holdings, Inc., an Arizona Corporation, Arizona Financial Credit Union, a domestic credit union.

Defendants

UNDER SEAL
**SEALED**

Case No.:  CV-24-00387-PHX-ESW

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**TO BE FILED *IN CAMERA* AND UNDER
SEAL PURSUANT TO 31 U.S.C. § 3730**

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

For her complaint, Relator/Plaintiff Jane Doe alleges as follows:

### INTRODUCTION

1. Relator/Plaintiff Jane Doe (the "Relator") files this lawsuit under seal against Defendants Pinnacle Bank, PB Financial Holdings Inc. (collectively "Pinnacle"), and Arizona Financial Credit Union ("AZFCU") (collectively all Defendants "Defendants") for violations of the False Claims Act, 31 U.S.C. § 3729 et seq. ("False Claims Act" or "FCA") and of the Financial Institutions Reform, Recovery, and Enforcement Act, 12

-1-

U.S.C. § 1833a ("FIRREA"), and under the SEC Whistleblower statute 15 U.S. Code § 78u–6 et seq., and for Successor Liability to recover all damages, civil penalties and all other recoveries provided for under those Acts on behalf of the United States of America. These claims arise out of false and fraudulent claims under the Small Business Act, Public Law 85-536, 15 U.S.C. §§ 631 et seq.

2.  Defendant Pinnacle made material misrepresentations to SBA when arranging, originating, structuring and processing its SBA loans. It also concealed from SBA facts that the Bank was bound to disclose.  It made such misrepresentations and concealed such facts in order to obtain millions of dollars' worth of guarantee payments from the SBA.

3.  Through the use of these schemes, Defendant Pinnacle was consistently one of the top two to three SBA lending institutions in Arizona, despite being so much smaller than the large national banks in the state. On information and belief, Pinnacle used many of these same schemes in their residential lending as well, through CEO Mike Thorell's brother, Residential Lending Manager Greg Thorell.

4.  Defendant Arizona Financial Credit Union ("AZFCU") merged with and assumed the liabilities of Defendant Pinnacle Bank.

5.  Relator blew the whistle on fraudulent conduct to Defendant Pinnacle's Board of Directors while at Defendant Pinnacle Bank and was retaliated against and terminated in March 2018.  Relator was never criticized or terminated for work performance at any bank, other than the retaliatory termination by Defendant Pinnacle Bank after she blew the whistle on fraud.

6.  The Relator became aware of Defendants' false claim scheme alleged herein due to Relator's positions as original source. The Relator commenced this *qui tam* action against Defendants for the bank loans at issue based upon Relator's personal experiences and industry insider information. Relator, as an employee of Defendant Pinnacle Bank, had access to loan application, underwriting, and approval information such as proprietary Defendants'computer files revealing the marketing schemes, approvals, and volume of loans by Defendant Pinnacle Bank.

## PARTIES

7.  Plaintiff/Relator Jane Doe is a citizen of the United States and an Arizona resident. She has worked in the banking industry since 1984, and as a Vice President with banks since 2006.  She began working for Pinnacle Bank as Vice-President/Business Banking Officer in June 2017.

8.  Defendant PINNACLE BANK offers a range of banking services, including online banking, loans and accounts, and serves a broad range of commercial, individual and agricultural customers. Pinnacle is an Arizona corporation which has its principal place of business at 14287 North 87th Street, Suite 123, Scottsdale, AZ 85260. Pinnacle has six (6) bank locations in Phoenix and Scottsdale, Arizona.

9.  Defendant PB FINANCIAL HOLDINGS INC., on information and belief, is a holding company for Pinnacle Bank, and has its principal place of business at 14287 North 87th Street, Suite 123, Scottsdale, AZ 85260. Defendants Pinnacle Bank and PB Financial Holdings Inc. are hereafter referred to as "Pinnacle".

10. Defendant AZFCU merged with and assumed all liabilities of Defendant Pinnacle Bank November 2019. AZFCU is an Arizona corporation with its principal place of business at 333 N. 44th Street, Phoenix, AZ 85008.

## JURISDICTION AND VENUE

11. Jurisdiction is founded upon the Federal False Claims Act (the "Act" or the "False Claims Act"), 31 U.S.C. § 3729 et seq., specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345, as well as 12 U.S.C. §1833a.

12. This Court has personal jurisdiction over Defendants and subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in the District of Arizona and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the District of Arizona.

13. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §1391 because the acts proscribed by 31 U.S.C. §§ 3729 et seq. and complained of herein occurred in this District, and Defendants transacted business in this District, including by originating loans and transferring loans to investors headquartered in this district.

## SBA Loans and Defendant Pinnacle as a PLP Lender.

14. The SBA Section 7(a)Loan Guaranty Program authorized the SBA to lend money to eligible, credit-worthy businesses through loan guarantees; to participating lenders. All 7(a) loans which the SBA guarantees must meet 7(a) underwriting criteria.

15. Originally, all loans guaranteed by the SBA were reviewed and approved by the SBA itself. In 1983 Congress authorized the Preferred Lenders Program (hereinafter referred to as "PLP") to provide a carefully selected group of lenders the: authority to make loans on behalf of the SBA. Under PLP, title SBA delegates loan approval, closing,

and most servicing and liquidation authority and responsibility to these selected lenders. This means that although the loan applications are privately reviewed and processed, the SBA would ultimately be liable for up to 85 percent of the loan amount if the borrower defaults, as long as this lender met SBA guaranty requirements.

16. The SBA calls companies to which it has delegated this power "Preferred Lenders". The; SBA has promulgated standard operating procedures ("SOPs") which address its obligation to repurchase a guaranteed loan and have the force and effect of law. Preferred Lenders enter into a loan guaranty agreement with the: SBA which requires the lender to evaluate, originate, and service SBA guaranteed loans to SBA's specifications. SOP 50 10(4), Ch. 3, ¶7.a. and in 13 CFR §120 et seq. According to SOP 50 10(4),¶17 and 13 CFR. §120.452(a), the "SBA's business loan eligibility, credit policy, and procedures apply to PLP loans." Defendant Pinnacle is a Preferred Lender, which gives it underwriting authority without having to obtain approval from the SBA for each loan.

17. Preferred Lenders enter into a Loan Guaranty Agreement with the SBA which requires the lender to issue, close, and disburse guaranteed loans subject to SBA rules and regulations. Preferred Lenders are required to fully protect the interests of the SEIA. The lenders must send the SBA a quarterly report which contains current and accurate information about loan delinquencies. The SBA is not obligated to purchase the guaranteed percentage of the outstanding balance of a loan if the SBA determines that the lender's failure to provide timely and accurate status information caused any substantial harm to the government.

18. PLP lenders specifically certify:

    a. the loan was closed pursuant to the SBA's loan authorization;

    b. the date of the note;

    c. the maturity date;

    d. the date of the first and final disbursement;

    e. the total amount of the disbursement;

    f. that the guaranty fee was mailed, to the SBA;

    g. that all required compensation agreements are attached to the lender certification;

    h. the signer of the certification is authorized to do so; and

    i. the applicant is a small business according to 13 CFR Part 121, the loan's proceeds will be used for an eligible purpose, and the owners and managers of the applicant business are of good character.

19. Pinnacle, as a Preferred Lender, "is responsible for all PLP decisions regarding eligibility (including size) and creditworthiness." 13 CFR §120.452(c). A "PLP Lender must analyze a PLP applicant's eligibility in the same way that SBA analyzes eligibility for a regular 7(a) loan applicant." SOP 50 10(4), Ch. 3,¶8.a. The Preferred Lender must prepare a "credit memorandum in the loan file. The credit memo must show that the lender gathered enough information to make: an informed analysis about repayment ability for the loan." SOP 50 10(4), Ch. 3,¶8.b. The credit memo must accurately and adequately discuss capitalization, repayment ability management ability, collateral, and credit history. Federal regulations require Pinnacle to prove its "substantial compliance" with the terms of title loan guaranty agreement. This requirement of "substantial compliance" under §120.202-5 (now replaced by § 120.524) is characterized as providing the SBA with a potential affirmative defense to liability on its loan guaranty, or as setting forth a condition precedent to the SBA's guaranty obligation.

20. "PLP Lenders guidelines require the lender to hire seasoned processing, servicing and liquidating SBA-guaranteed loans. The lender does a thorough and complete credit analysis of the applicant and establishes that the loan is of such value as to reasonably assure repayment." The Preferred Lender is also responsible for confirming that all PLP loan closing decisions are correct, and that it has complied with all requirements of law and SBA regulations. (SOP 50 10(4) Ch. 3,¶8 and 13 CFR §120.452(c)). The SBA has no obligation to purchase its share of the guaranteed loans unless the Lender has substantially complied with all 13 C.F.R. §120.202-5, which governs the SBA's obligation to honor its loan guarantees and provides: "SBA shall be released from obligation to purchase its share of the guaranteed loan unless the Lender has substantially complied with all of the provisions of these regulations, the Guaranty Agreement and the Loan Authorization." Pertinent SBA regulations explicitly impose the burden of proof of substantial compliance on Pinnacle.

21. The loan application must disclose any amounts paid to representatives, Including loan brokers, "that helped the applicant obtain the loan, describing the services performed, and disclosing the amount of each fee paid or to be paid by the applicant to the Agent in conjunction with the performance of those services." SOP 50 10(4), Subpart A-Ch. 6-112;13 CFR §120.195; see also SBA Form 159, "Compensation Agreement".

22. When servicing SBA-guaranteed loans, "a PLP lender can take all routine Servicing actions except any that would convey a preference on itself." SOP 50 10(4), Subpart D-Ch.3,¶9; see also 13 CFR §120.453. The Preferred Lender must use: "generally

-5-

Accepted commercial banking standards employed by prudent lenders [and] must liquidate any defaulted SBA guaranteed loan in its portfolio unless SBA advises in writing that SBA will liquidate the loan ." 13 CFR §120.453.

23. An important document in the guarantee process is the loan authorization, which was the document that listed the various conditions under which the SBA would provide the guarantee. The SBA would issue a loan authorization after the required forms and applications had been submitted. As part of the authorization, the lender had to agree that it would maintain evidence that loan proceeds were used only for eligible purposes in the approximate amounts listed on the loan authorization. Such evidence included a settlement statement, signed at the loan's closing by the lender and borrower, showing how loan proceeds were disbursed. If a lender did not intend to follow the terms and conditions of the authorization, the loan could not be originated.

24. In the event a loan defaulted, the lender would have to submit the loan Authorization and settlement, among other documents, to the SBA as part of a request that the SBA honor the guarantee and purchase the balance on the defaulted loan. By submitting these documents as part of the purchase request, the lender was representing to the SBA, among other things that it had complied with the terms of the loan authorization. The lender would also have to certify that the lender had "materially complied with the SBA Loan Program Requirements (as defined in 13 CFR 120.10) applicable to this loan." If SBA rules were not followed, the SBA could deny the guarantee, resulting in losses to the lending institution.

25. As a participant in the PLP program, Defendant Pinnacle was authorized to Issue SBA guarantees for new loans on behalf of the SBA so long as they followed all the relevant SBA guidelines. In these cases, the SBA conducted little to no review of the loan or the accompanying paperwork before the loan authorization was issued. One of the requirements of a PLP-originated loan was that the guarantee could not have been sought previously via a different SBA program without explicit approval by an SBA official. The lending institution had to certify to that fact on an eligibility questionnaire. The bank was required to maintain the documents, applications, and questionnaires from the origination process and submit them at the time the bank actually requested that the SBA purchase the balance on a defaulted loan. By submitting these documents as part of the purchase request, the lender was representing to the SBA, among other things, that it had complied with the terms of SBA loan authorization.

///

## Banc-Serve as Defendants' LPL

26. Lenders had the option of hiring a Lender Service Provider ("LSP") to package, originate, disburse, service or liquidate SBA loans on the lender's behalf, including the use of PLP. In carrying out any of these tasks, the LSP would act as the lender's agent and frequently respond directly with the SBA, submit authorizations requests and the loan-purchase requests to the SBA on behalf of the lenders.

27. Banc-Serv Partners, LLP ("Banc-Serv") was an LSP that packaged, originated, disbursed, serviced and liquidated loans guaranteed by the SBA on behalf of various federally insured lending institutions, including Defendant Pinnacle.

28. Defendant Pinnacle conspired with Banc-Serv to abuse their PLP authority by making false statements on loan-guarantee applications to the SBA on loan proceeds.

29. Defendants knew these practices were against SBA guidelines.

30. When the loans defaulted, Defendant Pinnacle and Banc-Serv as its agent would submit the same misrepresentations in the authorizations and questionnaires to ensure the SBA would compensate Defendant Pinnacle for the guaranteed portions of the fraudulent loans.

31. Over the course of, and in furtherance of, the fraudulent scheme, Defendant Pinnacle and Banc-Serv originated dozens of loans, totaling over $20 million in disbursements that were not eligible for SBA guarantees.

32. Defendant Pinnacle worked directly with Banc-Serv on various loans described below to obtain SBA guarantees for loans that did not meet SBA's guidelines and requirements.

33. On or about March 2019, Banc-Serv was indicted for loan and wire fraud. Four Banc-Serv executives, including Kerri Agee, were sentenced to prison for 17 years collectively for a 13-year span of defrauding the SBA.

34. At all times material hereto. Banc-Serve served as the LSP for Defendant Pinnacle Bank.

35. Specifically, Kerri Agee personally worked with Tim Romano and other Pinnacle Bank officers on dozens of SBA loans.

## SBA and Internal Audits

36. The U.S. Small Business Administration on or around October 10, 2017 communicated with Pinnacle Bank/Tim Romano in accordance with SBA Policy Notice 5000-1332, dated December 29, 2014. The SBA conducted a Full PARRiS Review

("PARRiS Report") to audit the operations of Pinnacle.  PARRiS is anacronym for Portfolio Performance, Asset Management, Regulatory Compliance, Risk Management and Special Items. The SBA found that Pinnacle violated 3 of the 5 Component Assessments as corrective actions were required for Asset Management, Regulatory Compliance and Risk Management.

37. The PARRiS report confirmed several findings against Pinnacle by the SBA in its 2017 loan portfolio review, including knowingly:

- Failing to comply with 13 C.F.R. §§120.180 (requiring lenders to comply and maintain familiarity with SBA Loan Program Requirements;

- Failing to comply with 13 C.F.R. 120.520(c) and 120.524(a) for failing to submit written status reports to the SBA within 15 business days after receiving notice that the SBA purchased its guaranty;

- Failing to forward unscheduled remittances within two days to the Fiscal and Transfer Agent;

- Failing to use the proper SBA form 159 (instead using an expired form) to document loan fees on numerous loans;

- Failing to secure credit scores prior to submitting an SBA loan to the Loan Guaranty Processing Center;

38.  The PARRiS report noted that Pinnacle Bank's portfolio contains 116 loans totaling $120.22 MM that were sold on the secondary market;

39. The PARRiS report noted that Pinnacle Bank's Franchise Rate exceeds 10%, resulting in a high risk flag.  Pinnacle Bank knowingly ignored the SBA's high risk warning by completing  the Which Wich and Desert Ribs loans described below.

40.  The SBA noted that Pinnacle's rapid loan growth of 53.2% was too fast, assigning the bank a Risk Flag. As a result of all the above errors by inexperienced personnel and of the aggressive expansion of its SBA loan portfolio, Pinnacle understandably experienced a 12-month loan default rate that was in excess of its banking peers, with six defaults in the prior 12 months.

41. In the spring of 2018, Pinnacle retained a consulting firm, the Preston Group, LLC, ("Preston Group") which specializes in SBA lending and loan reviews, to audit a sample of loan files.

42. The Preston Group confirmed the Relator's concerns that she provided to Pinnacle's management as detailed below.

43. Pinnacle falsely certified a number of issues when arranging SBA loans, including the date of the note, dates of first and final disbursement, and the "eligible purpose" of the loan proceeds and "good character" of the applicant's managers requirement for SBA loan application under the standards of 13 CFR Part 121.

44. While the litany of abuses Pinnacle committed against the SBA included a great deal of loan origination fraud, Defendants' fraud permeated the entire loan administration process. When a borrower defaults and collection enforcement is necessary, the Preferred Lender is required to liquidate all of the borrower's business assets before calling on the SBA to honor its guarantee. Defendant abused the liquidation process to manipulate the timing of when losses would be reported to the SBA, thus minimizing regulatory oversight so that they could maintain their eligibility to participate in the PLP.

45. Pinnacle Bank strategically requested Loan Officer Tim Romano to resign as of October 31, 2018 following an audit requested by the bank and conducted by The Preston Group Report.

## FRAUDULENT SBA LOANS

### Delta Systems Engineering

46. Pinnacle Bank prepared and submitted SBA Loan number 8487205000 for a total of $5,000,000,00 for the borrower, Delta Systems Engineering, Inc. ("Delta Systems").

47. In addition to knowingly failing to disclose commission payments and submit the proper Form 159, Pinnacle knowingly and improperly converted the existing conventional loans and failed to disclose late fees, misrepresented cash flows and outstanding debts and use of loan proceeds.

48. According to the Preston Group, the existing 5 conventional loans should not have been refinanced as an SBA loan since those conventional loans were already on commercially reasonable terms.

49. According to the Preston Group, the conventional loan had been charged a late

fee twice in the last 12 months preceding the refinance to an SBA loan.

50. According to the Preston Group, the lowered life insurance was not adequate to cover one of the existing loans of $1,090.000.

51. According to the Preston Group, the cash flow statements were inconsistent and did not reconcile Delta Systems' ability to handle longer cash flow cycles.

52. According to the Preston Group, the principal of Delta Systems, Michael Kruke, failed to list outstanding debts of $172,252 and $119,939 even though they were listed on his personal credit report.

53. According to the Preston Group, there was no evidence that the loan proceeds were used for the purposes defined in the SBA Loan Authorization and instead used to pay accounts payable more than 90 days.

54. According to the Preston Group, there is no evidence of site visit by Pinnacle 60 days after loan became due.

55. In total, the Preston Group found 2 deficiencies in the Eligibility phase, 4 deficiencies in the Origination phase and 8 deficiencies in the Servicing phase.

56. Delta Systems filed for bankruptcy and the SBA paid the 80% of the guarantee on this $5,000,000.00 loan.

### Empire Fencing, Inc.

57. Pinnacle Bank prepared and submitted SBA Loan number 8395175007 for a total of $3,142,000.00 for the borrower, Empire Fencing, Inc. and EKDO Land, LLC ("Empire Fencing").

58. In addition to knowingly failing to disclose commission payments and submit the proper Form 159, Pinnacle knowingly and improperly misrepresented the length of the selling owners maintaining ownership, failed to disclose improper payments to employees or associates, misrepresented life insurance minimums.

59. According to the Preston Group, the owners selling the business the SBA Standard Operating Procedure by remaining officers and directors longer than 12 months.

60. According to the Preston Group, $111,252.85 was questioned as being an improper payment to associates.

61. According to the Preston Group, the lowered life insurance was not adequate to cover one of the existing loans of $1,090.000.

62. In total, the Preston Group found 1 deficiency in the Eligibility phase, 7 deficiencies in the Origination phase and 4 deficiencies in the Servicing phase.

63. Empire Fencing, Inc., filed for bankruptcy and the SBA paid the 80% of the

guarantee on this $3,142,000.00 loan.

## Which Wich

64. Pinnacle Bank prepared and submitted SBA Loan number 7410585006 for a total of $3.2 million for the borrower, Which Wich Sandwich ("Which Wich").

65. In addition to knowingly failing to disclose commission payments and submit the proper Form 159, Pinnacle knowingly and improperly structured accounts and business entities to fraudulently submit and liquidate this loan.

66. Which wich defaulted and the SBA paid the 80% of the guarantee on this $3,200,000.00 loan.

67. Pinnacle Bank knowingly allowed the owner, Peter Greene, to receive and keep his capital contribution of $250,000 during liquidation.

## Overwatch Precision

68. Every one of Pinnacle's business borrowers should have had a significant Deposit relationship with the bank and did not. Borrowers were often presented during loan application as having or creating a significant deposit relationship with the bank and did not. So, the Pinnacle Board was presented with loan applications stating that the borrower will bring over a significant deposit relationship but there was only a minimal balance in reality ("payment-only account").

69. In the case of the borrower Overwatch Precision in 2018 (Overwatch Tactical LLC d/b/a Overwatch Precision of Phoenix, AZ), Pinnacle Bank violated the SBA SOP by requiring the borrower move the company operating account or the loan will not fund. The borrower was unaware of the covenant. The Overwatch Precision owner came into the branch, having never met anyone from the bank, and asked "if I don't open an account you will hold my loan hostage?"

70. This occurred in February 2018. Relator had responsibility for helping a Pinnacle lender named Brigitte Corey get deposits from her loan customers. Brigitte had a customer called Overwatch Precision that had been applying for an SBA loan for quite some time, and Brigitte had not involved Relator regarding getting a deposit relationship established with Pinnacle. With no notice and with only two weeks remaining in the loan application process, Relator received a call from Brigitte, and a scathing email from Tim in February 2018. And the email from Tim said something to the effect that 'the Overwatch Precision SBA loan is ready to close, it would be a shame if we didn't close the deal because of the accounts', as if to blame Relator for not previously getting Overwatch to bring their business deposit accounts to the bank.

-11-

## Desert Ribs

71. Pinnacle Bank prepared and submitted this SBA Loan number for a total of $5,000,000,00 for the borrower, Desert Ribs, LLC, aka Famous Daves.

72. In addition to knowingly failing to disclose commission payments and submit the proper Form 159, Pinnacle knowingly and improperly converted the existing conventional loans and failed to disclose late fees, misrepresented cash flows and outstanding debts and use of loan proceeds.

73. Pinnacle Bank knowingly and deceptively failed to disclose to the borrower and the SBA that Pinnacle board member Steve Schwanz and his partner Ryan Kress owned the business entity Franchise Capital and secured a $50,000.00 commission payment for this loan.

74. Desert Ribs defaulted and the SBA paid the 80% of the guarantee on this $5,000,000.00 loan.

## LV Holdings

75. Pinnacle Bank prepared and submitted this SBA Loan number for a total of $1,000,000,00 for the borrower, LV Holdings.

76. In addition to knowingly failing to disclose commission payments and submit the proper Form 159, Pinnacle knowingly and improperly converted the existing conventional loans and failed to disclose late fees, misrepresented cash flows and outstanding debts and use of loan proceeds.

77. LV Holdings originally sought a loan amount of $800,000.00, but Mike Thorell convinced the borrower to apply for $1,000,000.

78. Pinnacle Bank knowingly represented to the SBA that the principal's rental property was his primary residence.

79. LV Holdings defaulted and the SBA paid the 80% of the guarantee on this $1,000,000.00 loan.

80. Pinnacle Bank knowingly violated liquidation protocol by failing to follow standard liquidation process through Arizona Liquidation or the like. Pinnacle Bank liquidated unbeknownst to borrowers to original seller for pennies on the dollar well below fair-market value.

## RECONSIDERARTION AFTER DENIAL

81. Pursuant to 13 C.F.R. §120.193 (Reconsideration after Denial), an applicant or

-12-

recipient of a business loan may request reconsideration of a denied loan or loan modification request within 6 months of denial. Unless the basis of the appeal is due to size determination, all other loans must be submitted to the office that denied the original request.

82. Pinnacle Bank, through Tim Romano, paid referral fees in excess of $ to Bonnie Rich Jessen, more specifically to her shell companies Rich Girl and/or Rich Girl Properties, Inc. Bonnie Rich Jessen falsified documents stating she is a broker to collect commission. Bonnie at time of a request was a loan officer for Bank of the West.

83. Tim Romano actively worked with Bonnie Jessen previously denied SBA requests. Tim was aware the opportunities had been previously declined but certain loans referred by Bonnie Rich Jessen through Rich Girl Properties, Inc., were processed through Pinnacle Bank in violation of 13 C.F.R. §120.193.

## Car Wash Pals

84. Bonnie Rich Jessen through Rich Girl Properties, Inc., referred borrower Car Wash Pals to Tim Romano at Pinnacle Bank within 6 months of Bank of the West denying Car Wash Pals loan application in violation of 13 C.F.R. §120.193

85. Tim Romano used the information from Bonnie Rich Jessen to learn why Bank of the West denied the loan to Car Wash Pals to ensure that the loan would be approved through Pinnacle Bank.

86. Pinnacle Bank failed to complete the proper Form 159 to report and document commissions to Bonnie Rich Jessen.

87. Pinnacle Bank caused the SBA to approve a $1.2 million to Car Wash Pals, which defaulted.

## Lalla Loubna LLC

88. Bonnie Rich Jessen through Rich Girl Properties, Inc., referred borrower Lalla Loubna, LLC, to Tim Romano at Pinnacle Bank within 6 months of Bank of the West

denying Lalla Loubna LLC's loan application in violation of 13 C.F.R. §120.193

89. Tim Romano used the information from Bonnie Rich Jessen to learn why Bank of the West denied the loan to Lalla Loubna LLC to ensure that the loan would be approved through Pinnacle Bank.

90. Pinnacle Bank as part of their scheme, utilized and completed the improper or expired Form 159 to report and document commissions to Bonnie Rich Jessen.

91. Pinnacle Bank caused the SBA to approve a $836,000.00 to Lalla Loubna LLC, which defaulted.

### Goldwater Assisted Living

92. Bonnie Rich Jessen through Rich Girl Properties, Inc., referred borrower Goldwater Assisted Living Facility to Tim Romano at Pinnacle Bank within 6 months of Bank of the West denying Goldwater Assisted Living Facility's loan application in violation of 13 C.F.R. §120.193

93. Tim Romano used the information from Bonnie Rich Jessen to learn why Bank of the West denied the loan to Goldwater Assisted Living Facility to ensure that the loan would be approved through Pinnacle Bank.

94. Pinnacle Bank failed to complete the proper Form 159 to report and document commissions to Bonnie Rich Jessen.

95. Pinnacle Bank caused the SBA to approve a $961,000.00 to Goldwater Assisted Living Facility, which defaulted.

### Improperly Disclosed Commissions.

96. 15 U.S.C. 642, 13 CFR parts 103 and 120, and the SBA's Standard Operating Procedure 50 10, requires that SBA lenders complete a fee disclosure form for 7(a) and 504 Loans for each agent that is to receive compensation for services provided to the borrower. Specifically, the SBA requires that Form 159 be completed by lenders in connection with any such application. The specific purpose of the form is to identify Agents and the fees

-14-

and/or compensation paid to agents by or on behalf of a small business applicant (the "Applicant") for the purpose of obtaining or expediting an application for a loan guaranteed by the SBA.

97. The Form 159 must be completed and signed by the SBA Lender and the Applicant whenever an Agent is paid by either the Applicant or the SBA Lender in connection with the SBA loan application. Each Agent paid by the Applicant to assist it in connection with its application must also complete and sign the form. When an Agent is paid by the SBA Lender, the SBA Lender must complete this form and the SBA Lender and Applicant must both sign the form.

98. Pinnacle Bank, as the SBA Lender, must inform the Applicant in writing that the Applicant is not required to employ an Agent or representative (including the SBA Lender) to assist the Applicant with the SBA loan application.

99. Commissions to an Agent cannot be contingent on the loan amount or approval. They must be earned.

100. If the compensation paid exceeds $2,500, the Agent must provide supporting documents that include: i) a detailed explanation of the work performed; and ii) the hourly rate(s) and the number of hours spent working on each activity. The SBA Lender must ensure that the supporting documents are attached to this form and the completed form with all supporting documents are uploaded to CAFS portal. Supporting documents and a detailed explanation are required even if the compensation is charged on a percentage basis.

101. The SBA's Standard Operating Procedures impose limitations on the maximum fees that may be assessed to any Applicant, including that in no event may a fee be assessed in excess of $30,000 in the aggregate, regardless of loan size.

102. The SBA's Standard Operating Procedures require that all fees assessed in relation to any application be reasonable and customary for the services actually performed.

103. As noted by the SBA in its PARRiS report, Pinnacle Bank used the expired Form 159.

104. For all of the loans described above, in knowing violation of 15 U.S.C. 642,

-15-

Pinnacle Bank failed to:

- Disclose to the Applicant/borrower in writing that the Applicant/Borrower did not have to use an Agent or Representative to assist with the SBA loan;

- Use a separate Form 159 for Pinnacle Bank and the additional Agent;

- Support the compensation with a detailed explanation of work performed and the hourly rates and number of hours;

- Comply with the maximum fee limitations imposed by the SBA's SOP;

- Limit fees to those that are reasonable and customary for the services actually performed in violation of the SBA's SOP;

- Avoid contingency-based fees.

105. Tim Romano, as Senior Vice-President and SBA Manager of Pinnacle, frequently received large monthly commission payments, and other commissions were made to Jared Shintaku, Scott Wilits, Rico Strohm, Brigitte Corey, and Ryan Shumaker. The accounts payable reports for the loan brokers showed that brokers were being paid repeatedly for bringing their loan business to the Pinnacle Bank executives.

106. A June 7, 2017 internal spreadsheet showed that Pinnacle Bank paid commissions to eleven employees involved in the SBA loan process for which Relator brought forth evidence of fraud, including SBA loans for the following clients that were named in Relator's complaint and on which loans Relator blew the whistle each of which were not disclosed to the applicable Applicants: Achilles Dining/ Taverna LLC, Best Life Pharma, Caro's Markets LLC, Delta Engineering, Edera LLC, GEM / Capital Litho, Ice Now LLC, and MM Wright. These and other SBA loans resulted in the following commission payments in 2017, and continued hyper-aggressive SBA loan portfolio growth through competition for commission payments resulted in large increases in commissions for some employees in 2018:

| Name | 2017 Cumulative Commissions | 2018 Cumulative Commissions |
|---|---|---|
| Patrick Anderman | $4,200.00 | |
| Brigitte Corey | $16,091.46 | $83,689.79 |
| Michele Glasscock | $8,400.00 | $10,500 |
| Jeff Harbick | $5,250.00 | |
| Robyn Krumbach | $3,850.00 | |

| Name | 2017 Cumulative Commissions | 2018 Cumulative Commissions |
|------|-----------------------------|-----------------------------|
| Justin Lucky | $6,960.00 | |
| Crystal Lyter | $8,050.00 | $9,100.00 |
| Megan Perez | $1,750.00 | |
| Tim Romano | $169,369.26 | $277,443.04 |
| Jared Shintaku | $109,335.70 | $129,249.23 |
| Ryan Shumaker | $7,134.97 | |
| Rico Strom | $36,097.34 | |
| Scott Willits | $0 | $16,186 |

## DEFENDANTS' ACTS OF RETALIATION

107. In early 2018, Relator had a bank career with over 25 years' experience as a bank Vice President. Relator had known Pinnacle Bank CEO Mike Thorell for over 15 years, as he was a business mentor to Relator. In the summer of 2017, Thorell advised Relator against taking a job with another bank, and instead soon after asked her to meet Pinnacle Bank COO Bo Hughes about a job as a Commercial & Industrial ("C&I") loan Business development officer ("BDO"). Thorell and Hughes asked Relator to take a pay cut from her current job to come and help them at Pinnacle to build their C&I loan portfolio and promised Relator that she would make up her lost salary income through increased bonuses and commissions for bringing in C&I loans. Hughes told Relator that "there was no cap" to what she could do, and that even though they did not initially have a bonus system for C&I loans, they would implement one quickly. Thorell and Hughes knew that Relator was routinely making $55,000 more a year between salary and bonuses at her present job but lied to her and told her that the millions in C&I loans she was booking per quarter at Pinnacle could be duplicated to her benefit at Pinnacle.

108. In fact, Thorell and Hughes had completely misled Relator. Pinnacle Bank had no C&I loan department, no one who could underwrite a C&I loan, and no policies or plans in place for getting into the C&I loan business. In fact, despite constant urging by Relator to get Pinnacle management to create a C&I loan program and her repeated attempts to bring millions of dollars' worth of C&I loan business to Pinnacle Bank, neither Thorell nor Hughes nor the Board of Directors nor anyone at Pinnacle ever took action to rectify the lack of a C&I loan program or to help Relator realize any of her lost

$55,000 in income.

109. Defendant Pinnacle Bank had no policies or procedures to deal with C&I loans. Relator did not even get to submit the loan packages for consideration by Pinnacle, since there was never any policy or structure in place to underwrite them or approve them. But Relator had 3 initial C&I loans that would have been submitted for close to $2 million. The customers Relator brought in were C&I good borrowers that Relator had known for years. These were not broker deals, Relator does not work with a broker, so Defendant Pinnacle would not have had to pay any broker fees. Relator is a banker that does not work with brokers, and does not take broker deals, making Relator's loans more valuable for her bank employers.

110 Within the first 45 days of employment with Pinnacle, Relator raised questions and concerns to Manager and bank COO Bo Hughes what is contributing to lack of deposits on hand with SBA loan production is over $120MM. Mike Thorell stated borrowers are required to have "full banking" relationship, regardless of C&I or SBA (violation of SOP) or loan **will not fund**.

111. Within the first 60-90 days of employment, Relator approached Randall Gaston regarding why Pinnacle was paying the brokers. Relator asked him about the broker fees and asked him why Pinnacle would be willing to do SBA loans but not willing to do C&I loans. Relator had never seen a bank pay brokers so much money per loan. Relator could not believe Pinnacle was paying so much to brokers. Gaston's response was "I know – I'm going to work towards that. I don't like paying a broker". Relator told Gaston that Relator was not used to seeing it, and asked why Pinnacle's SBA lenders, especially Tim Romano, were changing numbers and information on SBA loan applications based purely on information from the brokers, none of it made sense.

112. During these early few months, Pinnacle Bank COO Bo Hughes befriended Relator, asking Relator to come to her house to babysit her child, and sending Relator a card that says "Thank you for getting me to challenge ways of management" along with a $100 Nordstrom's gift card.

113. Relator said to Hughes early on, "how am I going to achieve my numbers here at the bank? They wanted us to do $12 million. We can't even do $100,000 in C&I loans. There's no ability whatsoever to do any business." Hughes spoke with Relator and texted Relator often about how much Hughes disliked Pinnacle CEO Mike Thorell, about a 14-page sheet of expectations she had if Pinnacle wanted her to stay, and talked frequently about leaving Pinnacle Bank together so that Hughes could pursue her dream of opening a

CPA firm for which Relator would be the marketer. Hughes texted and told Relator that if Thorell did not meet her needs and wants she would definitely leave Pinnacle or be looking for a new job.

114. Relator does not work on SBA loans. Relator's role always is deposits and C&I loans and establishing a full banking relationship with her customers, including making Relator's bank the bank for full business deposits for the customers. So, if Relator brings in a customer, Relator is not just going to do their building loan, the customer needs to bank with Relator.

115. Early on, Relator started to realize that not only was Pinnacle not going to put together a C&I loan program for her to find business for, but that Relator was seeing inappropriate activity going on by Pinnacle staff and executives. Within two months of starting work at Pinnacle, while sitting in the loan committee or other loan meetings, Relator realized that most of Pinnacle's SBA borrowers had less than appropriate depository relationships with the bank. The loan committee met about three times a week, and Pinnacle also held other loan meetings and business development meetings. With the constant conversation in the meetings by Pinnacle executives that "deposits are flat, you need to get deposits, you need to get out there and get full banking relationship", Relator realized how bad and inappropriate the situation had gotten for the bank.

116. Pinnacle CEO Mike Thorell would yell during meetings, "no loans without Full banking relationship". And about three months into the job, Relator then began saying to Pinnacle Bank COO Bo Hughes, "ok Bo, if we're doing $163 million dollars, how come our deposits are flat, we should not be flat. Doesn't make sense".

117. At that point, Relator came up with a "deposit program", to increase Pinnacle's deposits. And then Relator brought in $9 million dollars in new deposit money in about two months. Relator pitched a deposit plan to some of the top homeowners' association ("HOA") companies in the area, and all of them liked it and started bringing Pinnacle their deposits. It was $9 million dollars in new deposit money for the bank.

118. Relator said to bank COO Bo Hughes in about December that Relator would Look back at all the SBA loans from 2016 and 2017, when Pinnacle CEO Mike Thorell had yelled "you must have the deposits", to see if Pinnacle had actually received the deposits from those customers. Then Relator started to realize that all of these SBA loans that were represented to the Pinnacle Board of Directors that the customer had a "full banking relationship" with Pinnacle, actually had nothing, or had simply a payment only account to pay their loan payments from, but not their full business deposits.

119.  Not only was Pinnacle violating SBA SOPs by trying to make the "full Banking relationship" an expectation regarding the loan, but the lenders were not getting The deposits and were lying to the Board of Directors to get the SBA loans approved regardless. So, all those loans that they said were going to have a full banking relationship, they in many cases had nothing but a small checking account.

120. On or around February 9, 2018, Relator got a phone call from Pinnacle CEO Mike Thorell, who yelled at Relator for approximately 20 minutes while falsely accusing Relator of making "five employees uncomfortable" in a conversation Relator had had in the Deer Valley Office of the bank. Relator knew that Thorell was completely falsifying the story and gave him an opportunity to say who were the five Pinnacle employees so that Relator could discuss the problem with them, which Thorell was unable to do.

121. Previously, on or around February 3, 2018, Pinnacle Bank COO Bo Hughes was leaving on vacation. Hughes left Relator a voicemail (which Relator saved) saying, "Oh, I'm on a hike, just seeing what you're doing". However, after Hughes returned from vacation on or about February 13, 2018, she told Relator that Relator's role with Pinnacle Bank wasn't going to be what Hughes had said. Relator asked "what does that mean, basically do I need to find another job? Is that what you're telling me?". And Hughes said to Relator, "yes, pretty much". It was clear to Relator that Thorell and Hughes were retaliating against Relator for speaking about illegal and inappropriate SBA lending activities at the bank to Hughes and to Randall Gaston, and for repeatedly questioning Tim Romano's inappropriate and illegal SBA lending tactics during the loan committee meetings or other loan meetings.

122. Soon after that, Pinnacle had an HR consultant named Neely meet with Relator with additional falsified issues to harass and intimidate Relator. At the same time, Bo Hughes displayed inappropriate animosity toward Relator, as if Relator could not look right or say or do anything right. Pinnacle executives continued to ignore the building of C&I policies and program to ensure that the financial pressure on Relator continued, and executives and staff began ignoring Relator on the job – neither Mike Thorell nor most other employees would look at or talk to Relator.

123. Relator was supposed to move into an office. Pinnacle had two other BDO's, And the others had an office space in a branch, except for Relator. Bo Hughes kept telling Relator that the more engaged bankers with their clients are successful, but Relator was not given a place to meet with clients. Relator realized too late that Thorell and Hughes had hired Relator to fill a quota as set by the Board of Directors, but they never had any

real intention of building the area or allowing them to bring in C&I loans.

124. On February 28, 2018, Relator was asked to lie in an SBA loan presentation by Tim Romano and a loan officer on an account, and to claim that the client would have a "full relationship" banking, even though the client would not be keeping all their money at Pinnacle Bank.

125. At that point in February 2018, Relator was just trying to get through each day, and Thorell and Hughes were picking at Relator, coming after Relator to really make Relator uncomfortable and want to leave. Due to being retaliated against by Hughes and Thorell, Relator began working more out of the newly opened Deer Valley branch office of Pinnacle Bank. While Relator was there one day was when the two borrowers from Overwatch Precision walked in, and Relator had to take over because they were causing a disruption about Tim Romano and SBA lender Brigitte Corey trying to force them at the last minute to establish a deposit account with Pinnacle in order to get their SBA loan.

126. In this case, Relator had to refuse to go along with Romano's scheme to write a lie onto the loan application, stating that "the borrower will give us a chance to earn their deposit relationship after we close the loan". Romano needed this type of agreement written out, even if the Overwatch Precision borrowers were refusing to make it, as Romano was planning to go to the Board of Directors with this SBA loan for approval and lie to them saying that the borrower had a "full banking relationship" with Pinnacle. This is when the Relator told Romano, "no, because the 'we' is me and I'm not writing that in there, because he just told you no".

127. On March 1, 2018, Relator was speaking with a Pinnacle Bank employee named Justin Luckey that had resigned. During the discussion Relator asked why he was leaving.He stated that, "my signature was forged on a document by my manager and Mike [Thorell] did nothing but say 'thank you'. Bo [Hughes] constantly harassed me and due to some of the banking practices I had to leave. I would go to the Board, but I am too nervous".

128. On March 2, 2018, Mike Thorell called Relator and asked, "So tell me about This asshole", meaning the Overwatch Precision borrower that wouldn't open an account With the bank. Relator explained he wasn't an asshole, explained that the borrower was unaware of Pinnacle's full banking relationship requirement, and that no one from Pinnacle had ever met the borrower previously, which created the problem. Relator asked Mike Thorell how he was getting loans approved without him or anyone from the bank meeting the borrower. Thorell was trying to get Relator to corroborate that the reason the

Overwatch borrower walked out on the loan was because he was a difficult borrower, but Relator refused to agree with them, because the difficulties were all caused by Romano and Brigitte. This was going to cause problems for Thorell, Romano and Brigitte with Pinnacle Bank Board of Directors, who were demanding answers about why the Overwatch loan had been lost.

129 After being told to lie on the Overwatch loan application by Tim Romano the Sr.VP over SBA lending, Relator approached the Pinnacle Bank Board of Director's whistleblower program on March 3, 2018, to discuss concerns about many of the fraud issues raised in this complaint.

130. Relator had first approached the Board of Directors in August 2017 to tell an Old friend from college, Board member Quinn DeAngelis, about Pinnacle's complete lack of a program for C&I loans. Relator told DeAngelis at the time that "I am here to do C&I loans, and we don't do any. We don't have a process for it, every time I bring one it goes nowhere. I have really good clients, but the bank has nothing to offer them". DeAngelis told Relator to just slow down, "you have to remember that Mike Thorell has never been a commercial banker, and all his experience was in residential lending". To which Relator replied, "well this is my livelihood, how long do I have to slow down?". Relator told DeAngelis that at Relator's prior job at Bank of the West, C&I lenders had to do $4 million dollars' worth of loans per quarter, which was really hard to do. But at Pinnacle, there was no expectation because there was no way to do a C&I loan, and therefore no way for Relator to make up the substantial income lost by taking the job that was sold to Relator by Thorell and Hughes under false pretenses.

131. Relator decided to go to the Pinnacle Bank Board of Directors under the Bank's whistleblower policy in order to open an investigation into fraudulent activities at t the bank. On the morning of March 3, 2018, Relator called and texted with the Board's designated"whistleblower" program director, James Gilligan, for a meeting. Later that same day at 12:30pm, Relator met with the Whistleblower representative (James Gilligan) on the Board of Directors and two additional Board members (Quinn DeAngelis and Tom Reitz) to share concerns and findings of Relator's own investigation. The whistleblower representative on the Board stated that he did not know what to do, the Board thought that the whistleblower line would never be used.

141. James Gilligan, Quinn DeAngelis, and Tom Reitz, the three Board members who met with the Relator, were founders of the bank. Relator started the meeting by talking about Relator's own production, including generating $9 million dollars in new

deposit money, not in CD's. Relator then went on to talk about the loans and told them about some serious concerns they should have in the underwriting process, the closing p process, and went through a number of issues.

142. Relator brought up an example of Tim Romano keeping the Open Country account's bankruptcy off the information sent to the underwriters for their SBA loan application. Relator told them that Pinnacle CEO Mike Thorell says that the Board members "are all idiots and you won't read what's in front of you", which is why the bank executives were lying to them about SBA loan proposal information. Relator told them that when Tim Romano and others said that they had established "full banking relationships" with SBA borrowers, that a large number of them did not have anywhere near a fullbanking relationship and handed them a sheet with thirteen SBA borrowers who had less than "full banking relationships". Relator also told them that the Pinnacle SBA l loan application process was highly inappropriate, because Tim Romano and the bank's SBA lending officers were taking information for the loan proposal, such as valuation, credit information, etc., directly from the brokers that brought them the loans and were not independently verifying the information from the borrowers or establishing relationships with many of the borrowers at all.

143. The policy in the Pinnacle employee handbook had explained where to find The name and number of the Whistleblower contact on the Board of Directors but no further instructions. The employee handbook stated that a whistleblower's anonymity would be kept throughout the process. This did NOT HAPPEN. Relator's name was exposed to all of management and others at the bank. The Whistleblower representative on the Board turned over communications to an HR consultant, and Relator received no further communication from the Board after the meeting. The Board members offered no assistance to Relator on how to move forward with work, no protection from retaliation – nothing. No one from the Board followed up with Relator after that meeting or anytime thereafter to give Relator any information on what they would do with the information, or any way that their whistleblower protection policy would protect Relator in any way.

144. That Board of Directors meeting triggered another couple of meetings for Relator with the HR consultant, Neely. An additional meeting with Neely, Mike Thorell, and Bo Hughes occurred. These were not meetings to gather information on the illegal, inappropriate banking practices Relator had blown the whistle on to the Board members. Instead, Neely, Hughes, and Thorell came out against Relator, blaming Relator for responsibilities they falsely claimed Relator was not doing, and how Relator was not what

they expected when hired.

145. However, in those meetings, Relator did not allow Hughes, Thorell and Neely to push Relator around, and put the meetings back on the subjects that had been brought to the Board's attention during the whistleblower meeting - broker fees were too high, and the loans and the way Pinnacle does them were inappropriate, and the bank's processes were a mess. How none of it was making sense from Relator's perspective having worked for many years for actual successful banks.

146. At this point, almost no one at the bank was willing to talk to Relator outside of the formal meetings, as Thorell, Hughes, Romano, and others tried to create a hostile w work environment, hoping Relator would leave.

147. At that point, every day Relator did not know how to come into work and was feeling sick. Pinnacle hired a new HR person, who has subsequently been fired. Her name was Carmika Austin, and she had moved to Arizona from out of state.Pinnacle Bank COO Bo Hughes and Carmika then first gave Relator a verbal warning, and then Hughes and Carmika fired Relator on March 27, 2018. Hughes and Carmika falsely claimed they were firing Relator for three reasons – speaking disparagingly of management, production, and Relator's expense report not being on time. These were false allegations, because there were no witnesses to Relator speaking disparagingly of management and Hughes and Carmika refused to tell Relator who said that or what was said; there was no possibility of production because Pinnacle refused to institute policies and procedures to do C&I loans, and there was no acknowledgment of the $9 million in new deposits Relator had brought into the bank; and Relator's expense reports were turned in within the 60-day period allowed by bank policy.

148. After Relator got fired, Relator found out that the Board members Relator had met with for the whistleblower meeting had ordered an audit as a result of what Relator had told them. The Board left Mike Thorell in the same role as bank CEO, they left everyone or the moment.

149. The audit was considered "secret" or "special", Relator heard from other bank employees after leaving. It apparently included the thirteen SBA loan account names that Relator provided to the Board members during the whistleblower meeting. There was something wrong with each of the thirteen accounts – whether they did not have the deposits with Pinnacle, or the deposits were insufficient and the other bank executives and employees had lied to the Board and told them the borrowers had "full banking relationships" when the loans went to the Board for approval.

150. As a direct and proximate result of Defendants' unlawful actions as detailed herein, Relator has suffered loss of significant income, loss of employment, loss of dignity, suffered great humiliation, and emotional injuries manifesting physical illness and severe emotional distress.

151. As a result of the conduct by Defendants of which Relator complains, Plaintiff suffered and continues to suffer substantial losses in earnings and other employee benefits Relator will seek leave to amend this Complaint to state the amount or will proceed according to proof at trial.

152. Relator suffered emotional distress as a result of the conduct by Defendants of which Relator complains.

153. At all material times, Defendants, and each of them, knew that Relator depended on Relator's wages and other employee benefits as a source of earned income. At all material times, Defendants were in a position of power over Relator, with the potential to abuse that power.

154. Relator was in a vulnerable position because of Relator's status as a whistleblower, with a relative lack of power, because Relator had placed Relator's trust in Defendants, because Relator depended on Relator's employment for Relator's self-esteem and sense of belonging, because Relator relied upon Relator's employment as a source of income. Defendants were aware of Relator's vulnerability and the reasons for it.

**AZFCU MERGER**

155. On November 30, 2019, Defendant Pinnacle merged with Defendant AZFCU.

156. According to their official press release, it was "a historic merger between the two organizations."

157. Pinnacle Bank President and CEO stated in a written letter to his clients "it is with great excitement that I announce to you our intent to merge our bank with Arizona Federal Credit Union…the transaction will be structured with Arizona Federal purchasing all of the assets and assuming all of the liabilities of Pinnacle Bank."

158. Bo Hughes was an executive of Pinnacle Bank and her duties including oversight of all technology, audits and operations.

159. The BSA officer for Pinnacle Bank reported directly to Bo Hughes. On several occasions, Bo Hughes threatened the BSA officer on the speed of processing the loans.

160. Contemporaneously with the merger, Bo Hughes became the Executive Vice

President and Chief Risk Officer of AZFCU, with various meetings with AZFCU prior to the merger.

161. Bo Hughes had full knowledge of all the allegations against Pinnacle in this Complaint.

162. Their press release stated that "the merger occurred without a single position being eliminated."

163. Because Defendant AZFCU impliedly and expressly agreed to assume the liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

## CONCLUSION

164. Defendants' fraudulent activities, as set forth in this Complaint have resulted In significant fraud on the government's SBA loan systems, and on information and belief have also resulted in fraud in regard to Pinnacle's residential lending. These concerted schemes for fraudulent promotion and misrepresentation of Defendants' loans have resulted in hundreds of millions of dollars in unnecessary and fraudulent claims for funding, increasing the costs for the SBA and wasting the American taxpayer dollar.

### COUNT I; FALSE CLAIMS ACT

### FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS
### (All Defendants)

165. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants PINNACLE BANK,  PB FINANCIAL HOLDINGS INC., and AZFCU under the False Claims Act, 31 U.S.C. §§3729-32 and FIRREA 18 U.S.C. § 1833a.

166. Relator realleges and incorporate the allegations above as if fully set forth Herein and further allege as follows:

167. Defendants Pinnacle, from at least January 1, 2012 to the present date knowingly [as defined in 31 USC, §3729(b)] presented or caused to be presented a false or fraudulent claim or claims for payment or approval to an officer, employee or agent of the United States, in violation of 31 U.S.C. § 3729(a)(l) as described above.

168. Relying on these representations and certifications as described above, the

SBA transmitted Hundreds of millions of dollars in loan funding to Pinnacle.

169. As described above, Pinnacle knowingly presented and/or caused to be presented false claims in the form of false certifications to the SBA for payment or approval by the United States.

170. Because Defendant AZFCU impliedly and expressly agreed to assume the liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

171. By virtue of the false or fraudulent claims that Pinnacle made or caused to be made, the United States is entitled to recover multiple damages and penalties under the False Claims Act.

172. As direct and proximate result of Pinnacle's false claims, misrepresentations And concealments, the SBA has suffered a financial loss of up to several hundred million dollars and is entitled to damages in the amount of the loss.

173. Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in amount to be proven at trial, all in violation of 31 U.S.C. §3729(a)(1)(A).

## COUNT II; FALSE CLAIMS ACT

### FALSE CLAIMS ACT: MAKING OR USING FALSE RECORD OR STATEMENT
### (All Defendants)

174. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants PINNACLE BANK, PB FINANCIAL HOLDINGS INC., and AZFCU under the False Claims Act, 31 U.S.C. §§3729-32 and FIRREA 18 U.S.C. § 1833a.

175. Relator realleges and incorporate the allegations above as if fully set forth Herein and further allege as follows:

176. Defendant Pinnacle, from at least January 1, 2012, to the present date knowingly [as defined in 31 USC, §3729(b)] made, used, or caused to be made or used false records or statements material to a false or fraudulent claim or claims in violation of 31 U.S.C. § 3729(a)(1)(B).

177. Because Defendant AZFCU impliedly and expressly agreed to assume the

-27-

liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

178. By virtue of the false records or statements that Pinnacle made or caused to be made, the United States is entitled to recover multiple damages and penalties under the False Claims Act.

## COUNT III; FALSE CLAIMS ACT

### CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT
### (All Defendants)

179. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants PINNACLE BANK, PB FINANCIAL HOLDINGS INC., and AZFCU under the False Claims Act, 31 U.S.C. §§3729-32 and FIRREA 18 U.S.C. § 1833a.

180. Relator realleges and incorporate the allegations above as if fully set forth Herein and further allege as follows:

181. From at least January 1, 2012 to the present date knowingly [as defined in 31 USC, §3729(b)] Relator is informed and believe and based thereon allege that the Defendant Pinnacle and Banc-Serv, Rich Girl, Rich Girl Properties, Inc., and other as yet unnamed individuals acted in concert with one another to obligate the SBA to guaranty loans which did not meet SBA criteria by, inter alia, using LSP's, lenders, bankers, brokers, middlemen, title and escrow agents and others, to circumvent SBA requirements regarding capital injections, to fund business transactions at inflated prices, to use fraudulent financial information, to conceal compensation and related party transactions, and to make other false representations.

182. Because Defendant AZFCU impliedly and expressly agreed to assume the liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

184. Because of the Defendants' conduct as set forth in this Count, the UNITED STATES suffered at least millions of dollars in actual damages, all in violation of 31 U.S.C. §3729(a)(1)(G).

**COUNT IV; FOR VIOLATIONS OF RETALIATION STATUTE**
**(42 U.S.C. § 3730(h))**
**(All Defendants)**

185. This is a civil action by the Plaintiff, UNITED STATES, and Relator Jane Doe,on behalf of the UNITED STATES and on behalf of Relator Jane Doe, against the Defendants under the False Claims Act, 31 U.S.C. §§3729-32.

186. Relator Jane Doe realleges and incorporates the allegations above as if fully Set for herein and further alleges as follows :

187. Defendants retaliated by harassing Relator Jane Doe and taking actions to prevent Relator Jane Doe from properly carrying out job responsibilities as a result of lawful acts done in furtherance of this action, including reporting violations of federal banking statutes to Pinnacle Bank's management and refusing to engage in Defendants' schemes to induce fraudulent SBA and other loans.

188. Because Defendant AZFCU impliedly and expressly agreed to assume the liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

189. As a direct and proximate result of Defendants' unlawful and discriminatory constructive discharge and Defendants' various acts of retaliation described herein, Relator Jane Doe has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator Jane Doe's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

**COUNT V; FOR CIVIL PENALTIES UNDER FIRREA**
**(18 U.S.C. § 1833a)**
**(All Defendants)**

190. This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants PINNACLE BANK, PB FINANCIAL HOLDINGS INC., and AZFCU under the False Claims Act, 31 U.S.C. §§3729-32 and FIRREA 18 U.S.C. § 1833a.

191. Relator realleges and incorporate the allegations above as if fully set forth herein and further allege as follows:

192. For purposes of fraudulently obtaining money from the SBA program and other government lending programs, from at least 2008, Defendant Pinnacle knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Defendant Pinnacle knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, originated loans in violation of SBA and other federal lending guidelines; and sold loans originated in this manner to other FDIC insured banking institutions while knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, misrepresenting that they complied with the guidelines.

193. Defendant Pinnacle gained substantial profits from their fraudulent scheme, Having originated more than $700 million dollars in loans under these schemes.

194. Because Defendant AZFCU impliedly and expressly agreed to assume the liabilities of Defendant Pinnacle, because the transaction between Defendant Pinnacle and Defendant AZFCU amounted to a merger or consolidation, and because Defendant AZFCU had full notice and knowledge of the allegations in this Complaint prior to the merger by, among other channels, the imputed knowledge of Bo Hughes, Defendant AZFCU is liable for the actions as the successor of Defendant Pinnacle Bank as alleged in this Complaint.

195. This scheme to defraud has affected the SBA program and numerous federally insured financial institutions that purchased loans from Pinnacle.

196. Accordingly, Defendants are liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the UNITED STATES, demand that judgment be entered in its favor and against Defendants PINNACLE BANK, PB FINANCIAL HOLDINGS INC., and Arizona Financial Credit Union with judgment to be entered against Defendants for the amount of damages to the SBA Program arising (a)

-30-

from claims for Defendants' respective loans and (b) jointly and severally with such other Defendants for damages as set forth in each paragraph above and herein, as follows:

1. On Count I (False Claims Act; Presentation of False Claims) for triple the amount of the UNITED STATES' damages, plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendant presented to the UNITED STATES;

2. On Count II (False Claims Act; Making or Using False Record or Statement) for triple the amount of UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

3. On Count III (False Claims Act; Conspiracy to Violate the Federal False Claims Act) for triple amount of the UNITED STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

4. On Count IV (Retaliation) for all forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial;

5. On Count V (FIRREA) for triple the amount of UNITED STATES' damages Plus civil penalties of the maximum amount allowed by law be imposed for each and Every false claim that Defendants presented to the UNITED STATES.

Further, grant Relator a whistleblower's share of; 15 U.S. Code § 78u–6 - Securities whistleblower incentives and protection, and any settlement/action/fine from any other statutes culminating from publicly disseminated information within this filing.
Further, the Relator, on her behalf, requests that she receive the maximum amount as permitted by the law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.

Respectfully submitted, this 26th day of February 2024

UNITED STATES OF AMERICA, ex rel.

**Relator Jane Doe**

By: _____
Thomas R. Nolasco
HN Law LLC
16427 N. Scottsdale Road, Suite 130
Scottsdale, AZ 85254

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, I filed the foregoing document to the Clerk under seal.

_____

Thomas R. Nolasco